[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Pursuant to an Order entered on February 12, 1992, the Superior Court, the Honorable Robert D. Krause presiding, approved the application of Maurice C. Paradis, then Director of the Department of Business Regulation, as Receiver of Heritage Loan and Investment Company ("Receiver") to have the Court appoint a master with respect to claims relating to "off-line" deposit accounts at Heritage Loan and Investment Company ("Heritage"). See the Order dated February 12, 1992. As a result of said Order, William J. McAtee, Administrator/Master of the Superior Court was appointed as Master in the above-captioned receivership.
The Order provided that the Master:
 "is appointed . . . for the purpose of hearing and determining the claims filed with the receiver relating to `off-line' deposit accounts, which claims shall be deemed to include claims to funds evidenced by handwritten or typewritten savings passbooks, claims to funds alleged to have been withdrawn without the depositor's authority to do so, claims to funds evidenced by safekeeping receipts, and claims to any funds which are not verifiable on the computer records maintained by Heritage Loan and Investment Company;"
 "That Master McAtee shall have all of the powers of a Justice of the Superior Court with respect to the hearings and determination of `off-line' deposit account claims, including, without limitation, those powers enumerated in Rhode Island General Laws § 8-2-11.1 (1985 Reenactment)."
R.I.G.L. 8-2-11.1 provides, in pertinent part, that:
 "Such administrator/master may be authorized: (1) To regulate all proceedings before him; (2) To do all acts and take all measures necessary or proper for the efficient performance of his duties; (3) To require the production before him of books, papers, vouchers, documents and writings; (4) To rule on the admissibility of evidence; (5) To issue subpoenas for the appearance of witnesses, to put witnesses on oath, to examine them and to call parties to the proceeding and examine them upon oath;"
In accordance with the above, a hearing was held on the above referenced claim on December 7, 1993. At the conclusion of the hearing, the parties submitted Post-Hearing Memoranda.
Claimants, Bernard and Lucille Renzi maintained a number of personal and business accounts at Heritage.
On October 3, 1990, the balance of Passbook Savings Account Number 02-28-006869-2 was $106,493.88. It was on that date that Joseph Mollicone, Jr. went to Mr. Renzi's business office and asked Renzi to loan him $100,000. Claimants gave Mollicone a check in the sum of the requested $100,000 made payable to Heritage. No evidence of this loan, such as a promissory note, was produced at the hearing. On the following day, Mrs. Renzi received a check for $100,000 in payment for the aforementioned loan.
In addition to the loan request of Mollicone on October 3, he also asked the Claimants that they turn over to him all of their savings account passbooks that were then maintained at Heritage. Mr. Renzi testified that the reason Mollicone gave him for his request of the passbooks was that Heritage had loaned out too much money and had to put its paperwork in order. Mollicone also requested that Renzi sign a blank withdrawal slip and Renzi complied.
On the day that Mrs. Renzi received the $100,000 check, October 4, she asked for the return of the passbooks but was told that they were not yet ready. In fact, the Claimants would not see the passbooks again until some time at the end of October.
Mr. Renzi testified that he turned over a check for $100,000, approximately 13 Heritage passbooks and signed a blank undated savings withdrawal slip without question. Renzi believed the story that Heritage had to place its paperwork in order. However, Renzi did question whether or not a $100,000 check that Mollicone promised him would be "good". Mollicone, Renzi testified, assured him that it would be tomorrow! The Court will note that that was not the most reassuring of answers.
During the October 3 meeting at Renzi's office, Mollicone was accompanied, according to Renzi's testimony, by Peter Novola. When Renzi questioned Mollicone as to the identity of Mollicone's companion he was told that he was a bank examiner. Again, an answer that this Court would find alarming.
Heritage records show that the Claimed Account was closed on October 4, 1990. The closeout of this account is evidenced by a withdrawal slip admittedly signed by Bernard Renzi.
The passbook for the Claimed Account, introduced by Claimants, shows that this account carries a typewritten entry of $100,000. Both sides agree that this entry was typed by a typewriter of the same model maintained by Heritage. This entry was not reflected in the computerized records of Heritage.
Claimants assert that they met the burden of proof by presenting a passbook which is prima facie evidence of a deposit at Heritage. This is a reference to the $100,000 typewritten notation made on the Claimed Account. Claimants further assert that the burden now shifts to Heritage to explain or contradict that prima facie case. They cite as authorityAsh v. Livingston State Bank Trust Co., 129 So.2d 863
(1961), American Trust Savings Bank v. Montana, 89 So. 899
(1921); Fischer v. Morris Plan Company, 275 S.W.2d 393; Smithv. Richland State Bank, 9 So.2d 327 (1943).
Claimants also assert the doctrine of respondeat superior;
i.e., the principal or master becomes liable for the acts of his agents or servants. They argue that Mollicone, in breaching his obligation to Heritage, resulted in a breach of Heritage's responsibility to the Renzis.
The Receiver responds that the $100,000 typewritten entry in the Claimed Account following its closeout represents the sums due to the Claimants from Mollicone, personally, and do not represent a deposit liability of Heritage. The receiver bases this claim on the definition of the term "deposit" at 12 U.S.C. Sec. 1813 (1) which states in pertinent part:
 1) The unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, to a commercial, checking, savings, time, or thrift account, or which is evidenced by a certificate of deposit, thrift certificate, investment certificate, certificate of indebtedness, or other similar name, or a check or draft drawn against a deposit account and certified by the bank or savings association, or a letter of credit or a travelers check on which the bank or savings association is primarily liable. . .
 3) money received or held by a bank or savings association, or the credit given for money or its equivalent received or held by a bank or savings association, in the usual course of business for a special or specific purpose, regardless of the legal relationship thereby established, including without being limited to, escrow funds, funds held as security for an obligation due to the bank or savings association or others (including funds held as dealers reserves) or for securities loaned by the bank or savings association, funds deposited by debtor to meet maturing obligations, funds deposited as advance payment on subscriptions to United States Government securities, funds held to meet its acceptances or letters of credit, and withheld taxes; Provided, that there shall not be included funds which are received by the bank or savings association for immediate application to reduction of indebtedness to the receiving bank or savings association, or under condition that receipt thereof immediately reduces or extinguishes such indebtedness.
Receiver argues that Claimant was not depositing funds in the usual course of business and therefore the Claimed Account is not entitled to a depositor's priority with respect to their claim.
After a careful review of the evidence presented and consideration of the testimony at the hearing, this Court finds that the Claimants are not entitled to priority as depositors. By his actions on October 3, 1990, Claimant, by signing a savings withdrawal slip in blank and giving it to Mollicone was allowing Mollicone to take money, in any amount and on any date from any of his numerous accounts. Claimant, Bernard Renzi argues that because of a reading difficulty and the lack of a high school education, he did not understand the implications of what he was doing. The Court however is not convinced. Here is a successful businessman signing a clearly marked savings withdrawal slip, the purpose of which should have been clear. Furthermore, Mr. Renzi had other indications that something was terribly wrong. By Claimant's testimony, a banker comes to his office to borrow money, with him is a man he describes as a bank examiner, he asks for a check in the amount of $100,000 and further requests numerous savings passbooks. An ability to read is not required to realize that something is amiss. In fact, Claimant was concerned enough to ask if the check Mollicone was offering as payment of the loan was any good and received the answer that it would not be until the next day.
Claimant therefore allowed Mollicone to take control of his finances without restriction. The signed withdrawal slip was used to remove the sum of $100,000 from the claimed account. Claimant testified that he felt honored by Mollicone's request for help. This Court has no reason to doubt Claimant's statement. Claimant should have understood the extent of help he was giving Mollicone.
As to the typewritten entry in the Claimed Account, Claimant is not asserting that it represents a deposit by him. After the money was removed, using Claimant's signed slip, Claimant did not present $100,000 for deposit at Heritage. The Court agrees that the passbook, in and of itself, is a prima facie case for a deposit. However, the Receiver may introduce evidence to refute the prima facie case. But in the instant case the Claimant has done this for the Receiver. Claimants acknowledge that they did not make the $100,000 deposit after handing the passbooks to Mollicone. The typed notation therefore appears to be nothing more than an example of a "plug figure", so often referred to in these claims, being used by someone to denote funds that should have been in the bank but for some reason were not
For the reasons stated above, the claim is denied and counsel will prepare an order in accordance with this decision.